USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/2/05

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

CARTIER, a division of RICHEMONT
NORTH AMERICA, INC., et al.,

                    Plaintiffs,

    -against-

SYMBOLIX, INC., d/b/a PARK CITIES
JEWELERS, et al.,

                    Defendants.

------------------------------------------------------------x

05 Civ. 2777 (RJH)

**MEMORANDUM
OPINION AND ORDER**

       Cartier, a division of Richemont North America, Inc., and Cartier International, B.V. (collectively "Cartier") have moved for a preliminary injunction, seeking to enjoin Symbolix, Inc. d/b/a Park Cities Jewelers ("Park Cities Jewelers), its principal, Ahmed M. Saleh, and John Does 1-5 (collectively "defendants") from altering genuine stainless steel Cartier watches by mounting diamonds at various points on the bezels and cases to simulate Cartier's more expensive white gold watches and thereafter selling the altered watches. For the reasons set forth below, the Court grants Cartier's motion and enters a preliminary injunction against defendants.

## BACKGROUND

       Cartier has been developing, marketing and selling luxury watches in the United States for nearly a century. (Declaration of Ralph Destino ("Destino Decl.") ¶ 3.) Cartier owns the mark "Cartier" under United States trademark law and deploys the mark on both its watch and jewelry products. (*Id.* ¶ 4; Exs. A and B.)

1

Park Cities Jewelers sells used watches, including unworn Cartier watches. (Affidavit of Ahmed M. Saleh ("Saleh Aff.") ¶ 5.)[1] Saleh is an officer of Symbolix Inc., which does business as Park Cities Jewelers. (*Id.* ¶ 1.) At the request of customers, defendants work with a jeweler to place diamonds on the pre-owned Cartier watches in connection with the sale of those watches. (Transcript of Deposition Testimony of Ahmed M. Saleh ("Saleh Dep. Tr.") at 16-17.) Defendants are not associated with Cartier in any form or fashion. (*Id.* ¶ 4.)

In December of 2004, Cartier deployed a private investigator, Kathy Braunstein, to conduct an investigation into Park Cities Jewelers. (Declaration of Kathy Braunstein ("Braunstein Decl.") ¶ 1.) On December 13, 2004, Braunstein spoke to Saleh over the phone and expressed an interest in purchasing "a watch with diamonds on the bezel and case." (*Id.* ¶¶ 2, 3.)[2] Braunstein asserts that when she asked about a ladies' Cartier watch, Saleh responded that he could sell her a brand new Cartier Tank Francaise stainless steel model and add diamonds on the bezel and case for $6,000. (*Id.*) By comparison, Saleh said, a genuine Cartier Tank Francaise watch with diamonds would cost $14,500. (*Id.*) When asked whether he had made this watch on previous occasions, Saleh stated that he "had been doing it for ten years." (*Id.* ¶ 4.) Although Braunstein and Saleh did not finalize the terms of the deal, Braunstein called back on December 16, 2004 and discussed the purchase of a small-size, stainless steel, ladies' Cartier Tank Francaise watch, with diamonds added to the bezel and case for $5,750 without any sales tax. (*Id.* ¶ 5.) Saleh informed her that the work on the watch would take about one week at the longest and would be accompanied by a two-year Park Cities Jewelers' warranty. (*Id.*)

---

[1] Defendants nevertheless assert that they do not sell new watches. (Saleh Aff. ¶ 4.)
[2] Saleh does not contest that he discussed the sale of a watch with Braunstein but claims that he does not recall any specific details about the conversation. (Saleh Dep. Tr. at 46-7.)

On January 4, 2005, Braunstein called Saleh again regarding the Cartier Tank Francaise watch. (Reply Declaration of Kathy Braunstein ("Braunstein Reply Decl.") ¶ 3.) Braunstein told Saleh that Cartier did not manufacture the Cartier Tank Francaise watch in stainless steel with diamonds and that others viewing the watch might regard it as a fake. (*Id.* ¶ 4.) Saleh responded that the Cartier Tank Francaise model is made with stainless steel or white gold, but that diamonds are only placed by Cartier on the white gold model. (*Id.*) However, he reassured her that they "polished" the stainless steel to make it appear like "white gold; it looks exactly the same. They are exactly identical." (*Id.*) Saleh further stated that he had placed a picture of the Cartier Tank Francaise watch in stainless steel with diamonds in a recent advertisement in a Dallas newspaper around October or November of 2004 and that one could not tell the difference between the two watches. (*Id.* ¶ 6.)

Thereafter, Vanessa Halvorsen, an administrative assistant employed at plaintiff's law firm, posed as a relative of Braunstein and contacted Saleh, who transferred her call to another employee named Reza on January 20, 2005. (Declaration of Vanessa Halvorsen ("Halvorsen Decl.") ¶¶ 2-4.) Halvorsen told Reza she wanted to purchase a stainless steel Cartier Tank Francaise watch with diamonds. (*Id.* ¶ 4.) In response to Halvorsen's request, defendants purchased an unworn stainless steel Cartier watch from International Watch Company, located in Miami; the watch did not, at that time, contain diamonds. (Saleh Dep. Tr. at 25, 48.) Defendants shipped the watch to America's Diamonds, located in Los Angeles, and requested that the watch be polished and encrusted with diamonds. (*Id.* at 48, 56.) America's Diamonds placed diamonds on the watch, polished the watch and sent it back to defendants in Dallas. (*Id.* at 50.)

3

Defendants then shipped the watch without an accompanying Park Cities Jewelers' receipt to Halvorsen after she faxed her personal information including her credit card information and driver's license. (*Id.* ¶ 5.)

Ralph Destino, Chairman Emeritus of Cartier, inspected the watch received by Halvorsen and noted the "marked inferiority in the aesthetic appearance as compared to comparable genuine diamond-set Cartier watches." (Destino Decl. ¶ 8.) According to Destino, Cartier does not set diamonds on its stainless steel watches but rather exclusively places them on the higher-end white and yellow gold watches, including the Cartier Tank Francaise watch. (*Id.*) In Destino's opinion, the "combination of diamonds with stainless steel is not one offered or sold by Cartier; such a combination of a relatively inexpensive metal with expensive diamonds, appears incongruous and is certainly an aesthetically different watch from those sold and promoted by Cartier." (*Id.*) Moreover, he discerned that "the setting of the diamonds was done in a sloppy manner, resulting in a cheap, shoddy looking item." (*Id.*)

On February 24, 2005, plaintiffs sent defendants a letter a "cease and desist" letter demanding that defendants discontinue the advertising, promotion and sale of any altered Cartier watches. (Declaration of Milton Springut ("Springut Decl."), Ex. A.) By letter dated March 4, 2005, defendants' counsel responded, representing that while defendants purchase diamond-encrusted watches from various sources that may be factory originals or "aftermarket," defendants do "not alter, add, modify or recondition timepieces." (*Id.*, Ex. C.) This denial was flatly contradicted by Saleh's subsequent deposition testimony. (Saleh Dep. Tr. at 16-17.) On April 5, 2005, plaintiffs moved by *ex parte* order to show cause why a preliminary injunction enjoining defendants from their infringing activities

4

should not be entered before this Court. That same day, the Court granted the order to show cause. The Court subsequently heard oral argument on plaintiffs' motion for a preliminary injunction on April 21, 2005.

**DISCUSSION**

I.   Preliminary Injunction

A party seeking a preliminary injunction must demonstrate "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (internal citations and quotations omitted); Fed. R. Civ. P. 65.

To prevail under §1114 of the Lanham Act, a plaintiff asserting trademark infringement claims must show that the defendant "(1) without consent, (2) used in commerce, (3) a reproduction, copy or colorable imitation of plaintiff's registered mark, as part of the sale or distribution of goods or services, and (4) that such a use is likely to cause confusion." *Gruner + Jahn USA Pub. v. Jahr Printing and Pub. Co.*, 991 F.2d 1072, 1075 (2d Cir. 1993) (citing 15 U.S.C. § 1114(1)(a)). Where a protected mark is implicated, such as is the case here, Cartier may simply show a "likelihood of confusion" in order to establish both a "likelihood of success on the merits and irreparable harm." *New Kayak Pool Corp. v. R & P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir. 2001). Defendants have not seriously contested the first and third elements – e.g., that they altered and sold genuine stainless steel Cartier watches without Cartier's permission. The

5

remaining issues, therefore, are whether defendants' activity in reselling altered, stainless steel Cartier watches constitutes the unlawful exploitation of plaintiffs' trademark "in commerce" and is likely to cause confusion.

### A. *Use in Commerce*

Defendants argue that "[t]he Lanham Act does not apply in the narrow category of cases where a trademarked product is repaired or modified at the request of the customer" and not offered for sale to the general public. (Defs.' Opp'n Mem. at 3-4.) In other words, defendants appear to assert that they are entitled to modify and sell genuine stainless steel Cartier watches in response to specific requests by individual customers. Plaintiffs respond that the Lanham Act applies to defendants' sale of altered Cartier watches regardless of whether such alterations are done at the purchasers' request. (Pls.' Reply Mem. at 5.)

In the context of the resale of used goods, the Supreme Court has acknowledged that a second-hand dealer may reap some advantage from an existing trademark as long as the trademark holder is "not identified with the wear and tear or reconditioning by the dealer." *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 130 (1947). In *Champion Spark Plug*, the Supreme Court upheld the entry of an injunction requiring defendants, who collected, repaired and resold used spark plugs bearing the "Champion" trademark, to stamp the words "Repaired" or "Used" on the plugs. *Id.* Noting that the changes to the spark plugs were limited to restoring them to their original condition, the Supreme Court remarked that in any event, "inferiority is expected in most second-hand articles." *Id.* at 129-30. The Supreme Court thus reasoned that "[i]nferiority is immaterial so long

as the article is clearly and distinctively sold as repaired or reconditioned rather than as new" so as to give the manufacturer all the protection to which he is entitled. *Id.* at 130.

Yet the Supreme Court further opined that "[c]ases may be imagined where the reconditioning or repair would be so extensive or so basic that it would be a misnomer to call the article by its original name, even though the words 'used' or 'repaired' were added." *Id.* at 129. Indeed, following *Champion Spark Plug*, the Seventh, Fifth and Ninth Circuits have examined trademark infringement claims where the defendant substantially altered and sold luxury watches without removing the original trademark. In *Bulova Watch Co. v. Allerton Co.*, 328 F.2d 20 (7th Cir. 1964), the Seventh Circuit enjoined the defendants from selling recased watches using Bulova movements since the defendants' "substitution of a different crown and case ... resulted in a different product," such that the "case [was] not Bulova's and its fitting [did] not represent Bulova's workmanship." *Id.* at 24. The Seventh Circuit stated that "while the defendants are entitled to make a proper collateral reference to the source of the movement, without use of the trademark 'BULOVA' as such, any use of the trademark itself in connection with defendants' product must be in such a way that the public is not deceived." *Id.*

In *Rolex Watch USA v. Meece*, 158 F.3d 816 (5th Cir. 1998), the Fifth Circuit remanded a similar action to the district court to determine whether the defendant's alteration of genuine Rolex watches with non-genuine diamond bezels constituted trademark infringement. *Id.* at 827. In so holding, the Fifth Circuit reasoned that the Lanham Act "prohibit[s] a party from making changes in integral parts of a product and *then selling the modified product under the original trademark without full disclosure.*" *Id.* at 825 (emphasis added). The Ninth Circuit agreed with the rationales of both the

7

Seventh and Fifth Circuits, thereby enjoining the defendants from using unauthorized, generic parts in reconditioning genuine Rolex watches, adding diamonds to the bezels and then selling the watches. *Rolex Watch USA v. Michel Co.*, 179 F.3d 704, 710 (9th Cir. 1999). The Ninth Circuit subsequently concluded that the district court had "abused its discretion in not completely enjoining the use of Rolex's trademarks on the altered watches that [the defendants] sold." *Id.*

Here, defendants have admitted that they altered at least five stainless steel Cartier watches, which were reconditioned with diamonds and polished, and subsequently sold those watches to customers. (Saleh Dep. Tr. at 16.) Plaintiffs have produced evidence indicating that Saleh intentionally reconditioned the watches in such a manner as to make the watches appear "exactly the same" as the gold Cartier Tank Francaise model. (Braunstein Decl. ¶ 5.) In this sense, the changes defendants made to the watches are not the sort of simple reconditioning or repairs performed in *Champion Spark Plug*, but are unauthorized, substantial modifications resulting in "new construction[s]." *Meece*, 328 F.2d at 23. Saleh has not disputed the fact that he placed a picture of a reconditioned stainless steel Cartier watch with diamonds in 2004 issue of a Dallas magazine and declared to Braunstein that "you couldn't tell the difference" between it and the more expensive gold model. (*Id.* ¶ 6.) Defendants' acknowledged alterations, which serve to transform the original stainless steel Cartier watches into different products altogether, combined with their sale of the altered watches to customers, as well as their advertisement to the general public concealing the source of the modifications, thus place this case within the zone of unlawful trademark infringement prohibited in *Allerton*, *Meece* and *Michel*.

Notably, the cases cited by defendant are limited to instances in which the defendant simply offered customization or repair services without selling the actual goods themselves in competition with the plaintiff's products. In *U.S. Surgical Corp. v. Orris, Inc.*, 5 F. Supp. 2d 1201 (D. Kan 1998), the court found no trademark infringement where the plaintiff, a manufacturer of surgical instruments, failed to show evidence that the defendant, which cleaned, resterilized and returned the surgical instruments to their owners, either resold the instruments or advertised that it repaired the instruments. *Id.* at 1209. The court remarked that "the repair of a trademarked item alone is [not] sufficient to subject the defendant to trademark or unfair competition liability." *Id.* at 1209. Likewise, in *Excaliber Automobile Corp. v. Elite Autoworks, Inc.*, 733 F. Supp. 65 (E.D. Wis. 1990), the court found that the defendant, which "stretched" automobiles manufactured by plaintiff at the request of their owners, did not purport to compete against plaintiff in selling automobiles. Moreover, the defendant did not "purport to deceive the public into thinking that the stretched product [was] manufactured] by [the plaintiff]." *Id.* at 66. Rather, the defendants prominently advertised their stretching service as distinct from any sales of those automobiles in their promotional leaflets. *Id.*

The Court concludes that defendants do not merely provide innocent customization or repair services to the owners of trademarked goods as in *U.S. Surgical Corp.* or *Excaliber Automobile Corp.* Significantly, defendants' alterations are made in connection with, and as an integral part of, the sale of goods without indicating – indeed, concealing -- that modifications were unauthorized by Cartier. The alterations are made with the precise intent to deceive the public (though not the buyer) that the altered product is actually plaintiffs' higher-end, white gold, diamond-encrusted Cartier Tank

9

Francaise watch. Although defendants insist that these watches were only sold in response to customer requests, "[o]nce a product is injected into commerce there is no bar to confusion, mistake, or deception occurring at some future point in time." *Rolex Watch U.S.A., Inc. v. Meece*, 2000 WL 33582648, at *4 (N.D. Tex. Jan. 25, 2000); *Michel*, 179 F.3d at 706-7 (enjoining defendants from selling reconditioned used watches in response to orders from retail jewelers typically on behalf of retail customers). Additionally, the fact that some of the watches in question are "used" does not preclude application of the Lanham Act, since both "enhanced new watches and converted used watches ... pose the same threat of harm" to plaintiffs. *Rolex Watch, Inc. v. Meece*, 158 F.3d 816, 824 (5th Cir. 1998). Accordingly, plaintiffs have shown that defendants impermissibly used the Cartier trademark "in commerce" as contemplated by the Lanham Act.

### B. Likelihood of Confusion

Defendants nevertheless assert that "any claim that consumers may be confused is confounded" since the purchasers of the jewelry at issue are "sophisticated consumers who are conscious of the distinct nature and extent of the products at issue." (Defs.' Opp'n Mem. at 6.) The "likelihood of confusion" standard is governed by the multi-factor balancing test set forth in *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), keeping in mind that no single factor is dispositive and that the factors are not exhaustive.[3] However, "in cases involving counterfeit marks, it is unnecessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing." *Philip Morris USA Inc. v. Felizardo*, No. 03

---

[3] The Polaroid factors are as follows: the strength of the mark; the degree of similarity between the two marks; the proximity of the products; the likelihood that the prior owner will "bridge the gap"; actual confusion; the defendant's good faith in adopting its mark; the quality of the defendant's product; and the sophistication of the buyers. *Polaroid*, 287 F.2d at 495.

10

Civ. 5891 (HB), 2004 WL 1375277, at *5 (S.D.N.Y. June 18, 2004) (citing *Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("counterfeits, by their very nature, cause confusion").

Here, the sales of "enhanced" stainless steel Cartier watches designed to simulate the more expensive, gold Cartier Tank Francaise model constitute trademark counterfeiting under Section 32 of the Lanham Act. *See* 15 U.S.C. § 1114(1)(a). Defendants simulate the Cartier Tank Francaise watch by drilling holes into the bezels and cases and adding non-Cartier approved diamonds, as well as polishing the stainless steel to make it appear like white gold. (Braunstein Reply Decl. ¶ 4); *see Meece*, 158 F.3d at 826-27 (defendants' modification of genuine Rolex watches with non-genuine parts to resemble more expensive Rolex watches constituted trademark counterfeiting); *Westinghouse Elec. Corp. v. General Circuit Breaker & Electric Supply, Inc.*, 106 F.3d 894, 900 (9th Cir. 1997) ("When an original mark is attached to a product in such a way as to deceive the public, the product itself becomes a 'counterfeit' just as it would if an imitation of the mark were attached.")

Although defendants claim that they merely provide customization services to specific clients and not to the general public, the use of Cartier's trademark itself in connection with defendants' products is designed to deceive the public, as evidenced by defendants' display of the enhanced stainless steel Cartier watches in a widely circulated advertisement, offers to sell the altered stainless steel Cartier watches and remarks that the altered watches and genuine Cartier Tank Francaise watches with diamonds would appear "exactly identical." (Braunstein Decl. ¶ 3; Braunstein Reply Decl. ¶¶ 4, 6); *see Bulova Watch*, 328 F.2d at 23 (defendants' substitution of crown and case of authentic

11

Bulova watches "resulted in a different product" that required "complete and full disclosure" in ensuring that public would not be deceived by use of Bulova trademark). Particularly where there is an active secondary market (Destino Decl. ¶ 10; Saleh Dep. Tr. at 10-11), post-sale confusion to downstream purchasers is likely to occur where the defendant offers a cheap knockoff copy of the original manufacturer's more expensive product, thus "allowing a buyer to acquire the prestige of owning what appears to be a more expensive product." *Hermes Intl. v. Lederer de Paris Fifth Avenue*, 219 F.3d 104, 108 (2d Cir. 2000).[4] While defendants claim that customers of Cartier watches are "sophisticated," to the extent that they would not be confused by the counterfeit watches, Cartier faces the palpable loss of goodwill once consumers perceive the "cheapening" and dilution of the brand. *See Rolex Watch U.S.A., Inc. v. Canner*, 645 F. Supp. 484, 495 (S.D. Fla. 1986); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 975 (2d Cir 1987) (noting that sophisticated consumers of designer jeans will more likely be affected after seeing trademarked jean-stitching pattern on jeans not produced by trademark holder and consequently transfer goodwill).

Plaintiffs have thus established the likelihood of confusion resulting from defendants' use of the Cartier trademark, thereby also establishing the likelihood of success on the merits and irreparable harm. Indeed, the Second Circuit has explained that where there is "such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows." *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971). While confusion may certainly cause purchasers to turn to competitors' goods or refrain from buying the

---

[4] The Sixth Circuit has noted that the "fact that an immediate buyer of a $25 counterfeit watch does not entertain any notions that it is the real thing has no place in this analysis." *Esercizio v. Roberts*, 944 F.2d 1235, 1244 (6th Cir. 1991) (internal citations omitted).

product altogether, proof of the "loss of sales due to infringement is also notoriously difficult." *Id.* By satisfying the likelihood of confusion standard, plaintiffs have therefore met their burden to establish an appropriate basis for the entry of a preliminary injunction against defendants. *New Kayak Pool*, 246 F.3d at 185.

### C. Unclean Hands

Defendants finally argue that, notwithstanding the underlying merits of plaintiffs' claims, the Court should deny injunctive relief based on their use of an undercover investigator in ordering and obtaining the enhanced watches. (Defs.' Opp'n Mem. at 8.) A court may "deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith" related to plaintiffs' use of the trademark. *Gidatex S.R.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999) (internal citations omitted).

The Court perceives no merit in defendants' position since plaintiffs' employment of the private investigator is a matter collateral to the subject matter of this litigation – trademark infringement. *Id.* In any event, "[t]he prevailing understanding in the legal profession is that a public or private lawyer's use of an undercover investigator to detect ongoing violations of the law is not ethically proscribed, especially where it would be difficult to discover the violations by other means." *Gidatex S.R.L. v. Campaniello Imports, Ltd.*, 82 F. Supp.2d 119, 123 (S.D.N.Y. 1999) (internal citations omitted); *Apple Corp. v. International Collectors Society*, 15 F. Supp. 2d 456, 475 (D.N.J. 1998).

II.  Conclusion

Accordingly, the Court grants plaintiffs' motion for a preliminary injunction [3], enjoining defendants from altering and selling Cartier watches.

SO ORDERED

Dated: New York, New York
       June 1, 2005

_____
Richard J. Holwell
United States District Judge