UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARTIER, a division of RICHEMONT NORTH AMERICA, INC., et al.,

                         Plaintiffs,

    -against-

SYMBOLIX, INC., d/b/a PARK CITIES JEWELERS, et al.,

                         Defendants.

05 Civ. 2777 (RJH)

**MEMORANDUM OPINON AND ORDER**

On March 11, 2005, plaintiffs Cartier, a division of Richemont North America, Inc., and Cartier International, B.V. (collectively "Cartier" or "plaintiffs") initiated litigation against defendants Symbolix, Inc., d/b/a Park Cities Jewelers, its principal, Ahmed M. Saleh, and John Does 1–5 (collectively "defendants"), alleging trademark infringement and false designation of origin under § 32(1) and § 43(a)(1) of the Lanham Act, 15 U.S.C. 1114(1) and 1125(a)(1) respectively. These claims relate to Cartier's Tank Française line of watches. On April 5, 2005, plaintiffs moved for a preliminary injunction preventing defendants from modifying stainless steel Tank Française watches by mounting diamonds on the bezels and cases, applying polish to the watch in order to simulate Cartier's more expensive white gold Tank Française watches, and thereafter selling the modified watches. On June 1, 2005, the Court granted a preliminary injunction to prevent defendant from altering and selling watches. Cartier now has

moved for partial summary judgment with respect to liability on its federal trademark infringement claims and seeks to permanently enjoin defendants from altering and selling Cartier watches.

For the reasons set forth above, the Court grants plaintiffs' motion for partial summary judgment [22] and enters a permanent injunction against defendants.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed and taken in the light most favorable to defendants.

Cartier has been developing, marketing, and selling luxury watches in the United States for nearly a century. (Destino Decl. ¶ 3.) Cartier owns the word mark CARTIER and deploys the mark on both its watch and jewelry products. (*Id.* ¶ 4; Exs. A, B.)

Park Cities Jewelers sells various luxury brands, including used but unworn Cartier watches. (Saleh Aff. ¶ 5.)[1] Saleh is the manager and owner of Symbolix Inc., which does business as Park Cities Jewelers. (*Id.* ¶ 1.) Park Cities Jewelers is not an authorized Cartier dealer. (Defs. 56.1 Statement ¶ 17.)

In December of 2004, Cartier deployed a private investigator, Kathy Braunstein, to conduct an investigation into Park Cities Jewelers. (Braunstein Decl. ¶ 1; Defs. Mot. in Opp'n to Pls. Mot. for Partial Summ. J. and Permanent Inj. ("Defs. Opp'n") ¶ 2.) On December 13, 2004, Braunstein spoke to Saleh over the phone and expressed an interest in purchasing "a watch with diamonds on the bezel and case." (Braunstein Decl. ¶¶ 2, 3; Defs. Opp'n 2.)[2] Braunstein asserts that when she asked about a ladies' Cartier watch,

---

[1] Defendants nevertheless assert that they do not sell new watches. (Saleh Aff. ¶ 4.)
[2] Saleh does not contest that he discussed the sale of a watch with Braunstein but claims that he does not recall any specific details about the conversation. (Saleh Dep. Tr. at 46-7.)

Saleh responded that he could sell her a brand new Cartier Tank Française stainless steel model and add diamonds on the bezel and case for $6,000 (Braunstein Decl. ¶¶ 2, 3); defendants claim that Braunstein was the first to bring up the possibility of adding diamonds to a stainless steel model (Defs. Opp'n 2–3).  Saleh indicated that it would be possible to add diamonds to the stainless steel model.  (Saleh Aff. ¶ 14; Defs. Opp'n 3.)  By comparison, Saleh said, a genuine Cartier Tank Française watch with diamonds would cost $14,500.  (Braunstein Decl. ¶¶ 2, 3.)  Saleh also indicated that such diamonds would be "aftermarket diamonds" and that the work would be unauthorized by Cartier and void the warranty.  (Saleh Aff. ¶ 14.)  Although Braunstein and Saleh did not finalize the terms of the deal, Braunstein called back on December 16, 2004 and discussed the purchase of a small-size, stainless steel, ladies' Cartier Tank Française watch, with diamonds added to the bezel and case for $5,750 without any sales tax.  (Braunstein Decl. ¶ 5.)  Saleh informed her that the work on the watch would take about one week at the longest and would be accompanied by a two-year Park Cities Jewelers' warranty.  (Braunstein Decl. ¶ 5.)

On January 4, 2005, Braunstein called Saleh again regarding the Cartier Tank Française watch.  (Braunstein Reply Decl. ¶ 3.)  Braunstein told Saleh that Cartier did not manufacture the Cartier Tank Française watch in stainless steel with diamonds and that others viewing the watch might regard it as a fake.  (*Id*. ¶ 4.)  Saleh responded that the Cartier Tank Française model is made with stainless steel or white gold, but that diamonds are only placed by Cartier on the white gold model.  (*Id*.)  However, he reassured her that they "polished" the stainless steel to make it appear like "white gold; it looks exactly the same.  They are exactly identical." (*Id*.)  Saleh further stated that he

3

had placed a picture of the Cartier Tank Française watch in stainless steel with diamonds in a recent advertisement in a Dallas newspaper around October or November of 2004 and that one could not tell the difference between the two watches.  (*Id.* ¶ 6.)  Defendants do not dispute that the watch pictured in the advertisement was an altered Cartier watch. (Defs. Opp'n 18.)

Thereafter, Vanessa Halvorsen, an administrative assistant employed at plaintiff's law firm, posed as a relative of Braunstein and contacted Saleh, who transferred her call to another employee named Reza on January 20, 2005.  (Halvorsen Decl. ¶¶ 2–4.) Halvorsen told Reza she wanted to purchase a stainless steel Cartier Tank Française watch with diamonds.  (*Id.* ¶ 4.)  Halvorsen faxed her personal information including her credit card information and driver's license.  (*Id.* ¶ 4.)  Defendants then purchased an unworn stainless steel Cartier watch from International Watch Company, located in Miami; the watch did not, at that time, contain diamonds.  (Saleh Dep. Tr. 25, 48; *see also* Defs. Opp'n 3.)  At this point, Halvorsen had paid for the watch and the transaction was nonrefundable.  (Saleh Aff. 10.)  Defendants shipped the watch to America's Diamonds, located in Los Angeles, and requested that the watch be polished and encrusted with diamonds.  (Saleh Dep. Tr. 48, 56.)  America's Diamonds placed diamonds on the watch, polished the watch, and sent it back to defendants in Dallas.  (*Id.* at 50.)  Defendants then shipped the watch without an accompanying Park Cities Jewelers' receipt to Halvorsen.  (Halvorsen Decl. ¶ 5.)

Ralph Destino, Chairman Emeritus of Cartier, inspected the watch received by Halvorsen and noted the "marked inferiority in the aesthetic appearance as compared to comparable genuine diamond-set Cartier watches." (Destino Decl. ¶ 8.)  According to

4

Destino, Cartier does not set diamonds on its stainless steel watches but rather exclusively places them on the higher-end white and yellow gold watches, including gold watches in the Cartier Tank Française line.  (*Id.*)  In Destino's opinion, the "combination of diamonds with stainless steel is not one offered or sold by Cartier; such a combination of a relatively inexpensive metal with expensive diamonds, appears incongruous and is certainly an aesthetically different watch from those sold and promoted by Cartier."  (*Id.*)  Moreover, he discerned that "the setting of the diamonds was done in a sloppy manner, resulting in a cheap, shoddy looking item."  (*Id.*)

Saleh has also admitted that Park Cities Jewelers added diamonds and polished at least two stainless steel Tank Française watches.  (Saleh Dep. Tr. 16–17.)

On February 24, 2005, plaintiffs sent defendants a letter a "cease and desist" letter demanding that defendants discontinue the advertising, promotion and sale of any altered Cartier watches.  (Springut Decl., Ex. A.)  By letter dated March 4, 2005, defendants' counsel responded, representing that while defendants purchase diamond-encrusted watches from various sources that may be factory originals or "aftermarket," defendants do "not alter, add, modify or recondition timepieces."  (*Id.*, Ex. C.)  This denial was flatly contradicted by Saleh's subsequent deposition testimony.  (Saleh Dep. Tr. at 16–17.)  On April 5, 2005, plaintiffs moved by *ex parte* order to show cause why a preliminary injunction enjoining defendants from their infringing activities should not be entered before this Court.  That same day, the Court granted the order to show cause.  The Court subsequently heard oral argument on plaintiffs' motion for a preliminary injunction on April 21, 2005.

On June 1, 2005, the Court granted plaintiffs' motion for a preliminary injunction, enjoining defendants from altering and selling Cartier watches. *Cartier v. Symbolix*, 386 F. Supp. 354, 356 (S.D.N.Y. 2005). Cartier now has moved for partial summary judgment with respect to liability on its federal trademark infringement claims and seeks to permanently enjoin defendants from altering and selling Cartier watches.

## DISCUSSION

**1.    Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Of course, a "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *see also Quarles v. Gen. Motors Corp. (Motors Holding Div.)*, 758 F.2d 839, 840 (2d Cir. 1985) ("[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment."). In short, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

On a motion for summary judgment, the Court is required to view the facts in the light most favorable to the nonmoving party and to make all reasonable inferences in this party's favor. *E.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986). The initial burden rests with the moving party to make a prima facie showing that no material fact issues exist for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). Once this showing is made, the burden falls on the nonmoving party to demonstrate that a material fact issue does exist, thus mandating a trial. *Id.* While the nonmoving party may defeat a motion for summary judgment by establishing that there is a legitimate fact issue for trial, it "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citing *De Luca v. Atl. Ref. Co.*, 176 F.2d 421, 431 (2d Cir. 1949)). In trademark infringement cases, summary judgment "may be appropriate in certain circumstances, where the undisputed evidence would lead only to one conclusion as to whether confusion is likely." *Cadbury Beverages v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996) (citing *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991)).

### 2. **Trademark Infringement**

Section 32 provides that:

> Any person who shall, without the consent of the registrant--
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a). Section 43(a) of the Act creates a cause of action against any person who misuses a mark in a manner that is likely to cause confusion, and extends this protection to unregistered marks as well as registered marks and to "any false designation or origin":

7

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, . . . which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). "For both Lanham Act claims, [the plaintiff] must demonstrate (1) that it has a valid mark that is entitled to protection under the Act and (2) that [the defendant's] actions are likely to cause confusion as to the origin of the mark." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (2d Cir. 2003) (citing *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996)).

Cartier owns U.S. Trademark Registration 759,201 for the word mark CARTIER for watches and clocks. (*See* Destino Decl. Ex. A.) This mark has become incontestable. *See Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993) ("[A] mark registered by its owner shall be prima facie evidence of the registrant's exclusive right to use the mark in commerce on the product . . . . A registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." (citing 15 U.S.C. §§ 1065 & 1115(a))). Defendants do not contest the validity of Cartier's mark. Thus, Cartier need only establish a likelihood of confusion to prevail on its motion for a preliminary injunction.

Defendants are correct in noting that Cartier has failed to establish actual confusion. Defendants' customers knew that they were receiving watches that resembled, but were not in fact, the more expensive model. Defendant thus argues that plaintiffs have failed to offer "any admissible evidence of such confusion" because they

8

rely "solely on 'what if' scenarios."  Cartier is correct, however, that to receive permanent injunctive relief, it need only prove a *likelihood* of confusion;  a plaintiff need prove "actual consumer confusion or deception resulting from the violation" only for the recovery of money damages, which Cartier is not seeking in this motion.  *A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, No. 96 Civ. 9721 (PKL) (THK), 2005 U.S. Dist. LEXIS 925, 2005 WL 147364, at *6 (S.D.N.Y. Jan. 24, 2005) (internal citations omitted); *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 171 (2d Cir. 1991).

In determining the likelihood of confusion, the Court looks to the factors established in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), including:

> (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood of the products; (4) the likelihood that the prior owner will "bridge the gap" . . . ; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers.

*Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995) (citing *Polaroid*).

Before applying these elements to the facts at hand, it is useful to distinguish between the two types of infringement alleged in this case.  This distinction is best drawn by considering the two different types of transaction at issue in this case.  First, Saleh has admitted that Park Cities Jewelers added diamonds to the bezel and polished at least two stainless steel Tank Française watches that it did not purchase, but instead were brought by customers requesting such modifications.  Second, Saleh concedes that he purchased a stainless steel Tank Française watch on Halvorsen's behalf and then, as part of the same transaction, polished the watch and added diamonds to the bezel before delivering the

watch to her. Defendants attempt to argue that these transactions are indistinguishable because, in both cases, the modifications were made at the customers' request. However, the first transaction, taken as a whole, differs from second in that modification alone does not compete directly with the sale of new, white gold, diamond-encrusted Tank Française watches. Because these two situations present somewhat different issues of law, they are treated separately below.

      a.    *Sale and Modification of Watch as Part of Same Transaction*

In the second transaction, in which Halvorsen paid for a new stainless steel watch and requested its modification as part of the same transaction, the watch delivered to her at the conclusion of the transaction resembled a new, white gold, diamond-encrusted Tank Française watch. Indeed, the entire purpose of the modification was to make the stainless steel Tank Française watch resemble the diamond-encrusted, white gold Tank Française watch. (*See* Pls. 56.1 Statement ¶ 9; Defs. 56.1 Statement ¶ 9.) "The unauthorized use of an original label" in connection with the same goods as those for which the mark is registered is sufficient to state a claim of counterfeiting. 4 McCarthy on Trademarks and Unfair Competition § 25:15 (4th ed. 2006). Thus, although defendants did not imitate, copy, or reproduce Cartier's mark, but merely retained the mark on the watch, the watch delivered to Halvorsen was a counterfeit good. *See Cartier v. Aaron Faber, Inc.*, 396 F. Supp. 2d 356, 359 (S.D.N.Y. 2005) (agreeing with this Court that altering the stainless steel Tank Française model to resemble the diamond-encrusted model renders the watch counterfeit within the meaning of the Lanham Act).

Because the Court finds that the watch delivered to Halvorsen was a counterfeit, "the Court need not undertake a factor-by-factor analysis under *Polaroid* because

10

counterfeits, by their very nature, cause confusion." *Gucci*, 286 F. Supp. 2d at 287 (citing *Topps Co. v. Gerrit J. Verburg Co.*, No. 96 Civ. 7302 (RWS), 1996 U.S. Dist. LEXIS 18556, 1996 WL 719381, at *6 (S.D.N.Y. Dec. 13, 1996)). "There may indeed be the occasional tourist who actually believes that he is buying a genuine Rolex for $20 from a man selling watches out of a briefcase in Battery Park," *People v. Rosenthal*, 800 N.Y.S.2d 354 (N.Y. City Crim. Ct. 2003), but most people who purchase a knock-off Rolex or Cartier hope to benefit from the cachet of the premium watch without paying premium prices. *See id.*; *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 108 (2d Cir. 2000) (stating that "post-sale confusion can occur when a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product"). Accordingly, Saleh's disclosures to Braunstein that the diamonds would be "aftermarket" diamonds and that the work would be unauthorized by Cartier do not change the counterfeit nature of the watch itself.

Defendants also argue that "Cartier watches are very expensive. . . . Customers of this type of product are generally sophisticated. Given the discerning nature of Cartier's potential customers, it is unlikely that a casual observer will be confused as to the source of the goods." (Defs. Opp'n 12 (internal citations omitted).) This argument contradicts defendants' statement to Halvorsen that the two watches look "exactly the same" (Braunstein Reply Decl. ¶ 4), but even if true, the fact remains that the defendants' watch is a counterfeit. In addition, the "likelihood of confusion test concerns not only potential purchasers but also the general public." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382 (2d Cir. 1997); *cf. United States v. Hon*, 904 F.2d 803, 804–08

11

(2d Cir. 1990) (affirming conviction under 18 U.S.C. § 2320, which incorporates the confusion requirement in the civil Lanham Act, where judge instructed jury that they could find "likelihood of confusion" by someone merely viewing the watch). Defendants' modifications, together with the retention of Cartier's mark, render the watch sold to Halvorsen a counterfeit. Pursuant to the Second Circuit's logic in *Gucci*, Cartier has established a likelihood of downstream confusion with respect to the watch sold to Halvorsen, thus establishing that the simultaneous purchase and modification of a watch by defendants on Halvorsen's behalf violated the Lanham Act.

Finally, defendants argue that, notwithstanding the underlying merits of plaintiffs' claims, the Court should deny injunctive relief because plaintiffs' use of an undercover investigator demonstrates Cartier's "consent" to any alleged infringement. Defendants cite no authority for this proposition, asserting merely that "[t]he only reason that the Sample Watch was modified was because Cartier's representatives requested and insisted on it."[3] (Def. Br. 20.) The Court rejects this argument. Undercover investigators are "an effective enforcement mechanism for detecting and proving anti-competitive activity which might otherwise escape discovery or proof." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 119, 124 (S.D.N.Y. 1999), and the Court declines to accept the argument that purchases made at the request of undercover investigators imply consent by the trademark holder. *See also A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96 Civ. 9721, 2002 U.S. Dist. LEXIS 16323, at *30 (S.D.N.Y. Sept. 3, 2002) (explaining that "courts in the Southern District of New York have frequently admitted

---

[3] Of course, Defendants cannot and do not argue that the newspaper advertisement depicting a counterfeit Cartier watch was created at the behest of the Plaintiffs. Therefore, this consent argument, even if accepted, is fundamentally incomplete in that Plaintiffs could not possibly have consented to all of the infringing behavior at issue in this case.

evidence . . . gathered by investigators posing as consumers in trademark disputes" and listing cases in which such evidence was admitted).[4]

      b. *Modification of Pre-Owned Watches*

Defendants also admit to polishing and adding diamonds to at least two stainless steel Tank Française watches at the request of customers who had previously purchased the watches. Defendants are correct in pointing out that courts have rejected Lanham Act violations where defendants merely repair or restore a trademarked item. *See, e.g., U.S. Surgical Corp. v. Orris, Inc.*, 5 F. Supp. 2d 1201, 1209 (D. Kan. 1998) (finding no trademark infringement where plaintiff, a manufacturer of surgical instruments intended for single use, failed to show evidence that defendant who cleaned, resterilized and returned the surgical instruments to the hospital-owner purchaser, either resold the instruments or advertised that it repaired the instruments). Courts have also permitted modifications of trademarked goods where there is no likelihood of confusion with the goods manufactured by the owner's mark. *See, e.g.*, *Excalibur Auto. Corp. v. Elite Autoworks, Inc.*, 733 F. Supp. 65 (E.D. Wis. 1990) (finding no violation of the Lanham Act where there was no evidence that defendant who stretched luxury sedans made by Excalibur into limousines did not compete directly with plaintiff); *Ford Motor Co. v. Ultra Coachbuilders, Inc.*, No. 00 Civ. 0243 (VAP), 2000 U.S. Dist. LEXIS 20173, 2000 WL 33256536, at *5 (C.D. Ca. July 11, 2000) (finding no likelihood of confusion where plaintiff presented no evidence that Ford made limousines similar to those made by defendant from Ford's automobiles). Here, however, defendants are doing more than

---

[4] Defendants also raise the "unclean hands" defense rejected by this Court in its decision granting plaintiffs a preliminary injunction. *See Symbolix*, 386 F. Supp. 2d at 362. The Court rejects this argument again for the reasons given. *Id.*

13

merely repairing or restoring Cartier watches, and the modified watches look similar to genuine Cartier watches. As explained in the previous section, Cartier has established that someone viewing the modified watch is likely to be confused as to its origin. The question remains, however, whether the modifications constitute "use in commerce" within the meaning of § 32(1) and § 43(a)(1) of the Lanham Act.

Under 15 U.S.C. § 1127, a mark is in "use in commerce" when (1) the mark has been placed on the goods or their containers, labels, or the documents associated with the goods or their sale, and (2) the goods are "sold or transported in commerce." The Second Circuit has said that the "history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause, rather than to limit the Lanham Act to profit-seeking uses of a trademark." *United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 92 (2d Cir. 1997) (finding that certain political activity fell within the definition of "use in commerce" in § 32(1)(a) of the Lanham Act). The Ninth Circuit has added that "'use in commerce' appears to contemplate a trading upon the goodwill of, or association with the trademark holder." *See Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848 (9th Cir. 2002). Thus, a repair for an owner's personal use would not fall within the scope of the Lanham Act because such repairs do not trade upon the goodwill of a trademark holder. If, on the other hand, a repair or modification still bearing the original manufacturer's trademark is so extensive as to become a different product, that modification trades on the goodwill of, or association with, the trademark holder and is a "use in commerce." *Id.* at 856

In *Storz*, the Ninth Circuit considered whether a repair company that rebuilt Storz endoscopes on behalf of hospitals that owned the endoscopes was using Storz's trademark in commerce. The Ninth Circuit suggested a number of factors to consider in determining whether a modification results in a different product:

> Those factors include the nature and extent of the alterations, the nature of the device and how it is designed (whether some components have a shorter useful life than the whole), whether a market has developed for service and spare parts, and, most importantly, whether end users of the product are likely to be misled as to the party responsible for the composition of the product.

Id. at 857–58 (citing *see Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 709–10 (9th Cir. 1999). The court reasoned that, because the repair company "discarded every important part" of the broken endoscopes and retained only the block that carried the Storz trademark, downstream consumers (such as the doctors using the scopes) were potentially deceived about the scope's origin. The court found that although the repairs were performed at the request of the owners and did not involve a sale other than the sale of parts used to rebuild the scopes, there was a "use in commerce."

Applying these factors to the instant case, the Court finds that defendants' modifications are not "use in commerce" and thus fall outside the scope of the Lanham Act. Unlike the defendants in *Storz*, defendants here are not "discard[ing] every important part" and retaining only the portion of the product that bears the trademark; the components of the stainless steel Cartier watch are still incorporated in the final product. It is true that people viewing the modified watch are likely to be misled as to whether it is a genuine Cartier diamond watch (or at least the customer hopes that they will be), but these downstream viewers do not rely on the Cartier trademark in the same way that the surgeons using an endoscope relied on the representation that it was a genuine "Storz"

15

endoscope. *Id.* at 856 ("A mere repair for an owner's personal use must be contrasted with a complete rebuild where the rebuilt product will be used by a third party. . . ."); *see also Champion Spark Plugs v. Sanders*, 331 U.S. 125, 129 (1947) (explaining that marketing a product under the trademark of another "stakes the reputation of the plaintiff upon the character of the goods" (citation and internal quotation marks omitted)). Nor is there any concern that defendants are engaged in "fraud or palming off" because the modified watch is returned to the same customer at the conclusion of the transaction. *Champion*, 331 U.S. at 130 (suggesting that evidence of "fraud or palming off" would implicate unfair competition). For these reasons, the Court finds that the overall transaction, in which defendants' added diamonds and polished a stainless steel Tank Française watch at the request of a customer who had previously purchased the watch, did not constitute "use in commerce" within the meaning of the Lanham Act.

    c.    *Defendants' Advertisements*

Cartier also argues that defendants' use of an altered Cartier watch in its advertisements creates initial interest confusion. This type of confusion occurs where "potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase." *Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 514–15 (S.D.N.Y. 1993). "Such initial interest confusion is sufficient to infringe a trademark." *Katz v. Modiri*, 283 F. Supp. 2d 883, 899 (S.D.N.Y. 2003); *see Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons*, 365 F. Supp. 707, 717 (S.D.N.Y. 1973), *aff'd* 523 F.2d at 1342 (2d Cir. 1975) (finding that where potential

purchasers of Steinway pianos were initially interested in Grotrian-Steinweg pianos because of the name, the value of Steinway's trademark could be harmed).

Notably, defendants' newspaper advertisements did not disclose that the watch pictured was not an authentic diamond-encrusted Tank Française watch.  A would-be purchaser reviewing the advertisement would reasonably believe that defendants were offering a genuine Cartier item.  Only when the customer called or visited the store would the customer discover that the watch was counterfeit.  Thus, defendants' use of Cartier's trademark in defendants' advertisements helps defendants gain "crucial credibility during the initial phases of a deal."  *Mobil Oil*, 818 F.2d at 259.  To the extent defendants used this credibility to promote the sale of non-genuine diamond-encrusted Tank Française watches, this initial interest confusion violated Cartier's trademark.

### 3.     **Permanent Injunction**

The standard for a permanent injunction is straightforward:  To obtain a permanent injunction, Cartier "must demonstrate (1) actual success on the merits and (2) irreparable harm."  *Gucci*, 286 F. Supp. 2d at 289 (citing *Wojnarowicz v. Am. Family Ass'n*, 745 F. Supp. 130, 148 n.13 (S.D.N.Y. 1990)).  As discussed above, the Court finds that offering to purchase a Cartier watch on behalf of a customer and then modifying or arranging for modifications to that watch so that it will resemble a more expensive Cartier watch violates the Lanham Act.

Accordingly, the Court grants Cartier's motion for a permanent injunction against defendants.  Defendants are permanently enjoined from marketing new or used Cartier watches that defendants have caused to be altered "in such a way as to deceive the general public as to the origin of the watch's craftsmanship."  *Aaron Faber*, 396 F. Supp.

17

2d 356, 361 (S.D.N.Y. 2005). The scope of this injunction does not "prevent defendants from providing customization services to owners of Cartier timepieces who on their own initiative seek to personalize their Cartier watches, which they have previously purchased," *id.* at 361, through engraving, changing the bracelet, adding diamonds, are polishing.

## CONCLUSION

For the reasons set forth above, the Court grants plaintiffs' motion [22] for partial summary judgment with respect to liability on its federal trademark infringement claims and grants plaintiffs' motion for a permanent injunction in the form contained herein:

1. Subject to the provisions set forth in Paragraphs 2 and 3 hereof, Defendants Symbolix, Inc. and Ahmed M. Saleh ("Defendants"), their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise are enjoined from altering, modifying, or causing to be altered or modified any "Cartier" watches, or selling, offering for sale, advertising, or distributing any "Cartier" watches that have in any way been altered or modified by any person or entity not authorized to do so by plaintiffs Cartier International, B.V. or Cartier, division of Richemont North America, Inc., including any such watches that have been modified by the setting of diamonds thereon by any person or entity not authorized by Plaintiffs.

2. Engravings and other minor modifications that do not deceive the general public as to the origin of the watch's craftsmanship shall not constitute "altered or modified" for the purpose of this permanent injunction.

3. Nothing in the foregoing injunction shall prevent Defendants from providing aftermarket services including modifications and alterations to any customer who already owns a Cartier watch and who without solicitation requests service thereof where such service terminates in return of the watch to the same customer upon completion of such service.

SO ORDERED.

Dated: New York, New York
       September 29, 2006

                                            Richard J. Holwell
                                            United States District Judge